**\*FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| **L.A.** and **Z.R**, on behalf of **Z.Kh.**, **Z.Y.**, **Z.I.**, and **Z.A.**, individually and on behalf of all others similarly situated, : | |
| : | |
| Plaintiffs,  : | Civ. Action No.:14-6895 (FLW) |
| : | |
| v.  : | **OPINION** |
| : | |
| **JOHN J. HOFFMAN**, Acting Attorney General of the State of New Jersey, : | |
| : | |
| Defendant.  : | |

---

**WOLFSON**, **United States District Judge**:

_Pro se_ Plaintiffs L.A. and Z.R. (collectively, "Plaintiffs"), who are convicted sex offenders, bring this case[1] on behalf of themselves and similarly situated individuals ("Class A"), as well as their minor children, Z.Kh., Z.Y., Z.I., and Z.A. (collectively, the "Minor Plaintiffs"), and similarly situated individuals ("Class B"), challenging recent amendments to the New Jersey Megan's Law[2] ("the Amended Statute"), which require the publication of certain of Plaintiffs' personal information to the New Jersey Sex Offender Internet Registry ("NJSOIR"). Plaintiffs have alleged the following violations of federal constitutional rights, through 42 U.S.C. § 1983, and similar violations of New Jersey constitutional rights: denial of substantive due process to all plaintiffs

---

[1] This case was originally assigned to the Honorable Joel A. Pisano, U.S.D.J. (retired), and upon his retirement, it was reassigned to me on March 10, 2015.

[2] New Jersey's Megan's Law was passed to address "[t]he danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness . . . ." N.J.S.A. 2C:7-1.

1

(Counts 1 and 2); denial of procedural due process to Plaintiffs and Class A (Count 3); denial of equal protection to Plaintiffs and Class A (Counts 4 and 5); and denial of equal protection to Minor Plaintiffs and Class B (Count 6). In the instant matter, Defendant John Hoffman, the Acting Attorney General of the State of New Jersey, ("Defendant" or the "State") moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiffs' Complaint for failure to state a claim. While the *pro se* Plaintiffs oppose the motion, they also move for appointment of *pro bono* counsel, pursuant to 28 U.S.C. § 1915(e)(1), to represent them, as well as Minor Plaintiffs.

For the reasons set forth below, Defendant's motion to dismiss is granted in part and denied in part. The Court dismisses all claims of Minor Plaintiffs and the substantive due process and equal protection claims asserted by Plaintiffs. However, Plaintiffs' procedural due process claim may proceed. Additionally, the Court grants Plaintiffs' application for *pro bono* counsel to represent Plaintiffs, but denies Plaintiffs' *pro bono* counsel application on behalf of Minor Plaintiffs as moot.

## I.   Background

The following allegations are taken from Plaintiffs' Complaint and are accepted as true for the purposes of this motion to dismiss. Because Plaintiffs have explicitly relied on exhibits attached to their Complaint to support factual allegations integral to their claims, I rely on these exhibits when necessary to clarify Plaintiffs' allegations. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (A "document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." (citation and internal quotations omitted)).

Plaintiffs were previously convicted of sex offenses in the State of New Jersey. Compl. ¶ 11. In 2002, Plaintiff Z.R. pled guilty to second-degree endangering the welfare of a child, that

2

was "however, treated as third-degree." Compl. ¶ 25. In 2005, Plaintiff L.A. was convicted of second-degree criminal sexual contact and third-degree endangering the welfare of a child, for molesting and photographing his fourteen-year-old stepdaughter, as well as first-degree endangering the welfare of a child, for possession of child pornography. Compl. ¶ 14. At the time of their respective sentencings, the courts found that each Plaintiff's conduct "was characterized by a pattern of compulsive and repetitive behavior." Compl. ¶ 11. Based on this finding, and Plaintiffs' willingness to undergo treatment, Plaintiffs were sent to the Adult Diagnostic Treatment Center ("ADTC"), instead of prison, to serve their sentences, as well as to receive therapy. Compl. ¶¶ 11, 78-79. After their release from ADTC, pursuant to Megan's Law, Plaintiffs underwent assessment of their risk of re-offense and were found to have a low risk of re-offense. Compl. ¶ 11. Accordingly, Plaintiffs were designated Tier 1 offenders (the lowest of three possible tiers) and were, therefore exempt from listing on the NJSOIR.[3] Compl. ¶¶ 11, 86-88. Plaintiff Z.R. has been living in the community, offense-free, for nearly ten years. Compl. ¶ 34. He currently works as an IT specialist and paralegal, and shares joint custody of his children with his ex-wife. Compl. ¶¶ 29-30. Similarly, Plaintiff L.A. has been living in the community, offense-free, for over two years, since his release in February, 2013. Compl. ¶ 12. "He currently resides in a boarding home while he pursues his education so as to enable him to start his own business" and retains parental rights to his two sons. Compl. ¶¶ 17-18.

The NJSOIR includes information about an offender's name and aliases, sex offenses for which the offender was convicted, the determined risk of re-offense (moderate or high), physical

---

[3] Sex offenders are assigned to three tiers based on their risk of re-offense: Tier 1 contains low-risk offenders, Tier 2 contains moderate-risk offenders, and Tier 3 contains high-risk offenders. Compl. ¶¶ 86-88.

description, car, address, and photograph. N.J.S.A. 2C:7-13(g). Had Plaintiffs been designated Tier 2 (moderate risk of re-offence) or Tier 3 (high risk of re-offence), or had a court specifically ordered that they be added to the NJSOIR notwithstanding their designations of Tier 1, such information would have been made available to the public via the NJSOIR website, with limited exceptions. N.J.S.A. 2C:7-13(b)-(c). The New Jersey legislature has expressed that publishing such information to the internet will enable potential victims of recidivist sex offenders to better protect themselves from sexual assault. N.J.S.A. 2C:7-12.

Recently, however, the New Jersey legislature enacted New Jersey Senate Bill S276, which as of July 2014, amended Megan's Law and mandated that sex offenders who had been found compulsive and repetitive at sentencing be listed on the NJSOIR, regardless of their classification as low risk to re-offend. Compl. ¶ 1. Plaintiffs allege that in July 2014, based on this amendment, the New Jersey Attorney General directed the addition to the NJSOIR of all Tier 1 and Tier 2 individuals previously found to be compulsive and repetitive, including Plaintiffs. Compl. ¶¶ 91-93. Because of their addition to the NJSOIR, Plaintiffs claim that they will suffer harassment, loss of employment and housing, possible physical abuse and assault, psychological trauma, and property damage. Compl. ¶ 47. In support of these allegations, Plaintiffs assert that other individuals who have been listed on public sex offender registries have been severely injured physically, psychologically, and economically by public backlash and the retaliatory attacks of private parties. Compl. ¶ 158. Plaintiffs further allege that such attacks often endanger or harm minor children of listed offenders, forcing offenders to move out of the familial home for fear of injury to their children. Compl. ¶ 168.

Plaintiffs also aver that scientific studies have demonstrated that convicted sex offenders who are found compulsive and repetitive at sentencing are actually less likely to re-offend than

4

convicted sex offenders without such a finding. Compl. ¶ 121. Plaintiffs ascribe this difference to the treatment compulsive and repetitive sex offenders receive at ADTC. Compl. ¶¶ 124-25. Additionally, Plaintiffs claim that convicted sex offenders who are found compulsive and repetitive at sentencing, but are later assessed as having a low risk of reoffending for the purposes of tier designation, and who have been living offense free in the community for at least eight years, are actually less likely to commit a subsequent sex offense than any randomly selected male member of the general public. Compl. ¶¶ 126-39. Plaintiffs submit that because they are statistically less likely to offend than other convicted sex offenders not listed on the NJSOIR, and any male in general, adding them to the NJSOIR does not serve any rational purpose of the State.[4] Compl. ¶ 48.

In their Complaint, Plaintiffs challenge the well-settled notion that the NJSOIR can rationally be expected to serve its express purpose of protecting the public from recidivist sex offenders. Specifically, Plaintiffs allege that the NJSOIR does not protect children from stranger recidivist sex offenders in their neighborhoods. Compl. ¶ 144 Plaintiffs further allege that only a small percentage of sexual assaults are committed by strangers or recidivists. *Id.* Moreover, Plaintiffs contend that those strangers who do commit sexual assaults, do so far from their own neighborhood. Compl. ¶ 152. Plaintiffs also cite to an unspecified statistical study which concludes that offender registries in general do not enhance public safety. Compl. ¶ 155. Thus, Plaintiffs allege that providing the public with a list of convicted sex offenders in their neighborhood does

_____

[4] Plaintiffs' argument in this regard is based on a study that focused on convicted sex offenders who have been living offense free in the community for at least eight years. Seemingly, Plaintiffs' argument based on this study does not apply to Plaintiff L.A., because he has only been released from incarceration since February 2013.

little to help protect the citizens at large, or their children, from sexual assault. In that regard, Plaintiffs maintain that the toxic social environment that the NJSOIR creates for sex offenders actually increases their risk of recidivism. Compl. ¶ 178.

On October 29, 2014, Plaintiffs filed their Complaint and requested to proceed *in forma pauperis*; the case was assigned to Judge Pisano (retired), who denied Plaintiffs' request, finding that Plaintiffs did not meet the requirement to be indigent litigants for the purpose of paying the filing fees. Thereafter, Plaintiffs paid the fees and the Complaint was filed. The Complaint is brought by Plaintiffs on their own behalf as well as on behalf of Minor Plaintiffs, Class A members, and Class B members. Class A consists of convicted sex offenders whose conduct was found, at sentencing, to be compulsive and repetitive, but who, upon release, were not listed on the NJSOIR because they were either 1) assessed as low risk to re-offend or 2) assessed as moderate risk to re-offend, but found to fall under one of the statutory exceptions to mandatory listing on the NJSOIR. Class B consists of minor children under the guardianship of Class A members and for whom Class A members retain parental rights.

The Complaint alleges that, by enforcing the Amended Statute, the New Jersey Attorney General has violated the rights of Plaintiffs, Minor Plaintiffs, Class A members, and Class B members through 42 U.S.C. § 1983 under the First and Fourteenth Amendments to the U.S. Constitution, as well as under the New Jersey Constitution. Plaintiffs explicitly state that they are not bringing any claims under theories of *ex post facto* application of law or double jeopardy. Pl. L.A.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss p. 28. As remedies, Plaintiffs seek to enjoin the State from enforcing the Amended Statute, as well as to declare the Amended Statute itself, and as applied to Plaintiffs and Class A members, unconstitutional. In lieu of an answer, Defendant moves to dismiss the Complaint.

6

After a full briefing of Defendant's motion to dismiss, the Court ordered Plaintiffs to show cause why the claims they assert on behalf of Minor Plaintiffs should not be dismissed without prejudice, because "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." *See Osei-Afriyie by Osei-Afriyie v. Med. Coll. of Pa.*, 937 F.2d 876, 882-83 (3d Cir. 1991) (quoting *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990)). In response, Plaintiffs moved for the appointment of *pro bono* counsel to represent Minor Plaintiffs. Defendant did not oppose this motion. Additionally, Plaintiffs have applied for appointment of *pro bono* counsel to represent Plaintiffs and the classes named in the Complaint.

## II.    Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citation and internal quotations omitted). The factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). As the Third Circuit summarized: "'stating . . . [a] claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips,* 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555); *see also Covington v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to

dismiss, a complaint merely has to state a plausible claim for relief." (citation and internal quotations omitted)). Moreover, where the plaintiff is proceeding *pro se*, the complaint should be "liberally construed," and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citation omitted).

However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Additionally, claim for relief must be plausible. *Id.* at 679. Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir. 2009). However, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings . . . [although a] limited exception exists for documents that are integral to or explicitly relied upon in the complaint." *W. Pa. Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 97 n. 6 (3d Cir. 2010) (quoting *Burlington*, 114 F.3d at 1426) (internal quotations omitted).

The Third Circuit has reiterated that "judging the sufficiency of a pleading is a context-dependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." *Id*. at 98. That said, the Rule 8 pleading standard is applied "with the same level of rigor in all civil actions." *Id.* (quoting *Iqbal,* 556 U.S. at 684) (internal quotations omitted).

### III.    Analysis

#### a.  *Substantive Due Process*

At the outset, I note that Plaintiffs' Complaint is not a model of clarity. It is difficult for the Court to discern the specific types of injuries they allege. Rather, Plaintiffs broadly allege that the Amended Statute violates their fundamental rights granted by the United States and New Jersey constitutions. It appears, however, Plaintiffs' claims can be categorized into three main types of injury: 1) violation of their privacy rights by publishing their personal information; 2) violation of their privacy rights as a result of potential harassment and attacks by the community, which will prevent them from freely making decisions regarding marriage, procreation, child care, housing, or employment, for fear of injury to their family; and 3) violation of their right to freedom of association, since harassment and attacks by the community will prevent them from freely forming social connections, for fear of injury to their friends.[5]

The Fourteenth Amendment Due Process Clause denies states the power to "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The fundamental rights protected by the Due Process Clause include most of the rights enumerated in the Bill of Rights. *Duncan v. State of Louisiana*, 391 U.S. 145, 147-48 (1968). Among these protected rights is the freedom of association, which Plaintiffs raise. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). Also protected under the Fourteenth Amendment is a set of rights characterized as "privacy" rights. *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). Privacy rights

---

[5] Additionally, Plaintiffs allege that their reputations will be damaged by the publication of their conviction records to the NJSOIR, but the Supreme Court has stated that "mere injury to reputation, even if defamatory, does not constitute the deprivation of a liberty interest." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 6-7 (2003). Thus, under well-settled law, Plaintiffs can have no due process claims arising from their injured reputations.

9

can be divided into two categories: 1) an "interest in avoiding disclosure of personal matters" and 2) "the interest in independence in making certain kinds of important decisions." *Id.* This second category of privacy rights involves "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Paul v. Davis*, 424 U.S. 693, 713 (1976). Plaintiffs allege that the Amended Statute violates their rights to privacy in both information and important decisions, as well as their right to freedom of association, because 1) their personal information will be made public, and 2) their ability to make important life decisions and 3) associate freely is hampered by public backlash and violence against listed sex offenders.[6]

A number of the injuries that Plaintiffs allege arise from the actions of private parties, rather than governmental entities. However, the Fourteenth Amendment only protects against constitutional violations by the state, and therefore it "offers no shield" against "private conduct,

---

[6] Plaintiffs also allege that their previous designation as Tier 1 at their tier hearings gave them settled expectations that their information would not be published to the NJSOIR. Compl. ¶¶ 47-48. Plaintiffs contend that because the Amended Statute retroactively affects important life decisions, such as marriage and procreation, which they made in reliance on these settled expectations, it is unconstitutional. Plaintiffs argue that courts have previously found the retroactive application of a civil statute, which affects reliance interests arising from prior judicial decisions is unconstitutional. However, Plaintiffs misapply legal precedent.

I note that Plaintiffs explicitly do not allege a constitutional violation under any theories of *ex post facto* application of law or double jeopardy. Pl. L.A.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss p. 28. Instead, they rely on two kinds of cases: 1) cases involving unconstitutional retroactive takings of property in violation of the Fifth Amendment Takings Clause (*E. Enterprises v. Apfel*, 524 U.S. 498 (1998)) and 2) cases analyzing whether a statute should be interpreted to apply retroactively, absent a clear indication from Congress that it intended such a result (*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994); *Ponnapula v. Ashcroft*, 373 F.3d 480 (3d Cir. 2004); *Oberhand v. Dir., Div. of Taxation*, 193 N.J. 558 (2008)). Pl. Z.R.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss pp. 28-33. This precedent has no bearing on the case at hand because Plaintiffs have claimed neither that the State has taken their property without just compensation nor that the Court should interpret the Amended Statute to only apply prospectively. Since Plaintiffs provide no legal support for their conclusion that the retroactive application of the Amended Statute is, in and of itself, unconstitutional, I conclude that this claim lacks legal basis.

however discriminatory or wrongful." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974) (citation and internal quotations omitted). In order to allege that his rights have been violated under the Fourteenth Amendment, a plaintiff must claim that the actions causing his injuries are somehow attributable to the state. *Flagg Bros. v. Brooks*, 436 U.S. 149, 156 (1978). Here, as to Plaintiffs' first category of injuries, clearly there is state action involved in the alleged violation of Plaintiffs' privacy in their personal information, because the Amended Statute explicitly orders the online publication of that information by the State. But, as to the remaining categories of Plaintiffs' injuries, the Amended Statute does not directly affect Plaintiffs' ability to make important life decisions or associate freely. *See Paul P. v. Verniero* (*Paul P. I*), 170 F.3d 396, 405 (3d Cir. 1999) ("Megan's Law does not restrict plaintiffs' freedom of action with respect to their families and therefore does not intrude upon the aspect of the right to privacy that protects an individual's independence in making certain types of important decisions."). The Amended Statute does not, for example, limit or direct convicted sex offenders as to who they can marry or whether they may have children. Rather, Plaintiffs are alleging that the Amended Statute indirectly causes these injuries because, but for the publication of their information to the NJSOIR, they would not be the targets of harassment and attacks from the community. Therefore, by so alleging, Plaintiffs are ascribing to the State responsibility for attacks on sex offenders by private individuals.

There are a number of tests that may be applied to determine whether an action by a private party can be considered state action for the purposes of a due process claim. *See e.g.*, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 291, 296 (2001) (employing both the state agency test, which examines whether a private entity is controlled by an "agency of the state," and the entwinement test, which examines whether the government is overly entwined with a private group's management); *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (employing

11

the nexus test, which examines whether there is a sufficiently close nexus between the state and a regulated private entity's actions, that such actions can be considered state actions); *S.F. Arts & Athletics v. U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987) (employing the public function test, which examines whether the private entity exercised powers which are traditionally exclusively reserved to the state). Most of these tests are inapplicable to the instant case, because they involve situations where the private actor is an entity regulated by the state, is an agent of the state, or is performing a function traditionally reserved to the state. *See e.g.*, *Brentwood*, 531 U.S. at 291, 296; *Wolotsky*, 960 F.2d at 1335; *S.F. Arts*, 483 U.S. at 544. Here, because Plaintiffs' alleged attackers are private individuals, unrelated to the State, the most appropriate test to apply is the state action test; under this test, a state cannot be held responsible for an action by a private individual, unless the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (citing *Flagg Bros.*, 436 U.S. at 166*; Jackson,* 419 U.S. at 353*; Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 170 (1970)*; Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173 (1965)).

Although Plaintiffs allege that New Jersey legislators and politicians have created a hostile environment for sex offenders by exaggerating their risk of recidivism and the dangers they pose, Compl. ¶¶ 202-4, Plaintiffs do not claim that these legislators have actively encouraged harassment or attacks on sex offenders. The statements of New Jersey legislators cited by Plaintiffs merely call for broader application of sex offender registries out of concern for public safety. Compl. ¶ 98. They do not condone or commend violence against sex offenders. While such attacks are disturbing, under the facts alleged by Plaintiffs, they are wholly the result of independent choices made by non-state actors. Indeed, "[a]lthough the public availability of the information may have

12

a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction . . . ." *Smith v. Doe,* 538 U.S. 84, 101 (2003). Failing to allege any state action which impinges on these rights is fatal to Plaintiffs' claims that these particular rights were violated under the Fourteenth Amendment. *See Paul P. I,* 170 F.3d at 405 (concluding that indirect effect of Megan's Law notification on sex offenders' families did not violate the "autonomous decision branch of the constitutional right of privacy"). Therefore, Plaintiffs have no cause of action against Defendant relating to the alleged interference with Plaintiffs' right to independently make important life decisions, or their right to associate freely.

On the other hand, Plaintiffs have plausibly alleged state action that implicates the privacy of their personal information, because the Amended Statute explicitly orders the publication of this information. Preliminarily, I note that Plaintiffs aver violations of their right to privacy under both the U.S. Constitution, which I will discuss below, and the New Jersey Constitution. Necessarily, however, Plaintiffs' privacy claims under the New Jersey Constitution fail, because in November 2000, the State of New Jersey passed an Amendment providing an explicit carve out to allow the publication of sex offenders' personal identifying information, "[n]otwithstanding any other provision of this Constitution and irrespective of any right or interest in maintaining confidentiality." N.J. Const. art. IV, § 7, ¶ 12; s*ee also A.A. v. State*, 384 N.J. Super. 481, 491 (App. Div. 2006). As such, any claim of privacy violations flowing from the Amended Statute, under the New Jersey Constitution, fails and is dismissed.

As to Plaintiffs' privacy claims under the U.S. Constitution, even after the amendment of the New Jersey Constitution, the Third Circuit found that New Jersey sex offenders have a "nontrivial privacy interest" in the publication of their home addresses, originating from privacy

rights granted by the U.S. Constitution. *See A.A. ex rel. M.M. v. New Jersey.* (*A.A. v. N.J.*), 341 F.3d 206, 212 (3d Cir. 2003). In determining whether information is entitled to constitutional protection, the Third Circuit focused on whether the information is "within an individual's reasonable expectation of confidentiality." *Id.* at 211. "The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 112-13 (3d Cir. 1987). The Third Circuit concluded in *Paul P. I,* and reaffirmed in *Paul P. II* and *A.A. v. N.J.*, that of all the information made available to the public under Megan's Law, a sex offender's home address is the only information where there is a "general understanding" that it is entitled to some privacy protection. *Paul P. I*, 170 F.3d at 404; *see also A.A v. N.J.*, 341 F.3d at 211; *Paul P. v. Farmer* (*Paul P. II*), 227 F.3d 98, 101 (3d Cir. 2000). Because the information that is available on the NJSOIR has not been expanded in the intervening years since the *A.A. v. N.J.* decision, I need not examine whether any new categories of information are entitled to privacy protection. Instead, I rely on the Third Circuit's finding that the only piece of information at issue here, that is entitled some degree of privacy protection, is Plaintiffs' home addresses.

Once a court has determined that a plaintiff's information is entitled to constitutional protections, the court applies a balancing test to weigh "the privacy interest at stake" against "the State's interest in disclosure." *A.A v. N.J.*, 341 F.3d at 211. Indeed, "[e]ven information that is entitled to privacy protection may nonetheless be subject to disclosure when the government's interest in disclosure is compelling." *Paul P. I*, 170 F.3d at 402. The Third Circuit has consistently found that the State's compelling interest in protecting potential victims of sexual assault from recidivist offenders outweighs sex offenders' privacy interest in their home addresses, and therefore New Jersey's Megan's Law does not violate sex offenders' rights to privacy. *A.A v. N.J.*,

341 F.3d at 213 (upholding publication of sex offenders' information to internet registry); *Paul P. II*, 227 F.3d at 107 (upholding dissemination of sex offenders' information to individuals in a court-authorized notification zone); *id.* at 404 (upholding dissemination of sex offenders' information to individuals likely to encounter them).The recent amendment of Megan's Law does not change the method by which sex offenders' information is disseminated, or broaden the categories of information that will be disseminated. *See* N.J.S.A. 2C:7-13(g). Thus, Plaintiffs are not suffering any additional intrusions on their privacy beyond those already sanctioned by the Third Circuit in *A.A. v. N.J.*[7] However, in an effort to challenge well-settled law, Plaintiffs argue that scientific research published since the decision in *A.A. v. N.J.* should prompt this Court to re-evaluate whether Plaintiffs' privacy interests in their home addresses are still outweighed by the State's compelling interest in publishing that information to protect the public.[8]

Plaintiffs raise three main arguments as to why the NJSOIR does not serve to achieve the State's compelling interest in protecting the public: 1) sex offender registries do not reduce recidivism rates and may actually increase the rate of recidivism; 2) it is so uncommon for a

---

[7] Plaintiffs argue that they have greater privacy interests in their personal information than those previously acknowledged by the Third Circuit, due to the passage of a law by the New Jersey legislature in 1997 to prohibit the disclosure of DMV records, except for specific purposes and to specific entities. Compl. ¶¶ 209, 227; *see also* N.J.S.A. 39:2-3.3, 39:2-3.4. However, since this law was passed in 1997, which was well before the Third Circuit's decisions in *Paul. P. I, Paul P. II,* and *A.A. v. N.J.*, it was part of the landscape that the court considered in determining that Megan's Law did not violate sex offenders' right to privacy. Moreover, the New Jersey Constitution specifically provides a privacy right carve-out for the sex offender registry, N.J. Const. art. IV, § 7, ¶ 12, which trumps any heightened privacy interest that may have been granted to sex offenders by N.J.S.A. sections 39:2-3.3 and 39:2-3.4.

[8] The Court notes that many of the studies cited by Plaintiffs were purportedly published prior to the *A.A. v. N.J.* decision. Thus, I question whether these studies actually provide any new information that was not already available to the *A.A. v. N.J.* court when it applied its balancing test.

recidivist sex offender to sexually assault a stranger in his own neighborhood, that warning potential victims about stranger recidivists in their area is a fruitless exercise; and 3) certain categories of sex offenders have such a low risk of re-offense that it is unnecessary to include them on the NJSOIR. In support of these arguments, Plaintiffs cite to various scientific articles and studies throughout their Complaint. Typically, the Court would review these studies as "documents that are integral to or explicitly relied upon in the complaint." *W. Pa. Allegheny Health Sys., Inc.,* 627 F.3d at 97 n. 6 (citation and internal quotations omitted); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an *undisputedly authentic document* that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). However, Plaintiffs failed to attach these studies to the Complaint or even provide their titles so that the Court itself might locate and review them.[9] Without access to these studies, the Court is unable, for example, to determine whether Plaintiffs have taken any of the studies' findings out-of-context, whether the findings of the studies are applicable to the instant case, and the soundness of the methodologies employed by the studies. Thus, I find that Plaintiffs' allegations of fact made in reliance upon such unidentified scientific studies do nothing to support the plausibility of their claims. Without these scientific studies, Plaintiffs have no other basis to support their arguments that the State no longer has a compelling interest in publishing sex offenders' information for the sake of protecting the public from

––––––––––––––––––––

[9] Plaintiffs identify these studies solely by author and date of publication. The Court has attempted to locate a number of these articles using only this information, but without the title of the article and the journal in which it was published, such attempts have proved unsuccessful. Plaintiffs provide appendices with isolated excerpts purportedly taken from these studies, but without the context of these excerpts, the Court is unable to take them at face value. Plaintiffs also provide their own summaries of these studies, but once again, the Court would need to review the studies to verify the accuracy of Plaintiffs' summaries.

recidivists. Thus, the Third Circuit's ruling that the NJSOIR does not violate sex offenders' privacy rights would necessarily control. *See A.A v. N.J.*, 341 F.3d at 213. Nonetheless, I address Plaintiffs' arguments below for the purposes of thoroughness. Even considering these "studies," Plaintiffs fail to state a claim.

First, Plaintiffs cite to multiple studies, which they claim demonstrate that public sex offender registries in general do not reduce sex offender recidivism rates or the total number of sexual assaults occurring in a given community. Compl. ¶ 155, Ex. H. They further contend that the toxic social environment created by the NJSOIR actually increases their risk of recidivism, completely contrary to the goal of the law. Compl. ¶ 178. Plaintiffs argue on this motion that based on these studies, the NJSOIR does not help protect the public from recidivist sexual offenders, and in fact, may endanger them further. However, these studies, even as described by Plaintiffs, do not necessarily support this claim. First, the two sets of studies, as summarized by Plaintiffs, contradict each other in that the former seems to indicate that recidivism has been completely unaffected, while the latter indicates that recidivism rates should be increasing under Megan's law. Second, Plaintiffs have not offered statistics of a kind and degree sufficient to show causation. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988). For example, even accepting these statistics as true, it may be the case that the NJSOIR *has* been helping to decrease the number of sexual assaults by convicted sex offenders, while other unknown factors have been negating these benefits. Similarly, even if publishing a convicted sex offender's information to the NJSOIR increases his likelihood of re-offending, this may be counterbalanced and even overcome by the protective effects of notifying potential victims of his identity and whereabouts. Therefore, Plaintiffs' summaries of these studies do not support the conclusion that the State has any less

compelling an interest in publishing sex offenders' personal information to the NJSOIR to protect the public.

Second, Plaintiffs cite to studies which they claim show that only a small percentage of sexual assaults are committed by strangers or recidivists, and those stranger recidivists that do commit sex offenses, only do so far from their own neighborhoods. ¶¶ 144, 152, Ex. H. Plaintiffs reason that these studies reveal the ineffectiveness of the NJSOIR in achieving its main purpose: protecting potential victims from stranger recidivist sex offenders residing in their own neighborhoods. However, Plaintiffs misconstrue the purpose of the Amended Statute. Indeed, the NJSOIR seeks, more generally, to protect against any recidivist sex offenders that members of the public may come in contact with, regardless of where they live. N.J.S.A. 2C:7-12. While this certainly includes stranger recidivists, it also includes recidivist sex offenders who may be friends, family, or acquaintances of potential victims. Further, this potential audience for the NJSOIR is apparent from the Complaint itself, where Plaintiffs allege that some of their current acquaintances and business partners are unaware of Plaintiffs' convicted sex offender status. In sum, Plaintiffs' references to studies do not demonstrate that the NJSOIR cannot reasonably achieve its stated purpose. Instead, their reading of the studies simply indicates that the NJSOIR is more useful to the public as a means of identifying who within their social circles is a convicted sex offender, so that they might better protect themselves.

Third, Plaintiffs point to studies that supposedly show that any random male member of the general public is more likely to commit a sex offense than sex offenders classified as low risk who have been living offense-free in the community for an extended period of time. Compl. ¶¶ 126-39. Consequently, they argue that adding such individuals to the NJSOIR would be just as useless as creating a public registry for all men. Plaintiffs cite to a study which purportedly found

18

that sex offenders who were initially considered low risk to reoffend at release had a 2.9% re-offense rate after successfully living in the community, offense-free, for eight years. Compl. ¶ 127. They next list multiple studies that, even as summarized by Plaintiffs, do not appear to clearly support their assertion that any random male member of the general public has a greater than 2.9% chance of committing a sex offense at some point during his or her lifetime. Compl. ¶¶ 131-38.[10] The only study that Plaintiffs cite that, based on their description, has some support for their claim is the 2012 Seto survey, which allegedly found that 3 - 4% of college-aged men "admitted to sexual contact with a prepubescent girl" after turning sixteen years old themselves. Compl. ¶ 133. But even accepting these statistics -- taken from different studies, and thus, different study protocols and margin of errors -- as true, they only suggest that the average male is slightly more likely to commit a sex offense than a very narrow subsection of the convicted sex offender population. Indeed, based upon their own descriptions, other studies that Plaintiffs reference put the recidivism rate for convicted sex offenders in general as high as 13.7% over six to ten years from release. Compl. ¶ 117. Ultimately, Plaintiffs conclude that posting the information of sex offenders with exceedingly low risk of re-offense to the NJSOIR cannot help protect the public in any meaningful way, and therefore impinges on their right to privacy.

---

[10] The survey of eighteen to twenty-seven-year-olds performed by Bagley, Wood, & Young in 1994, which allegedly found that 1% of the study subjects had performed "pedophilic activities," Compl. ¶ 131, cannot be applied as Plaintiffs contend, to support the assertion that generally men across their lifetime are more than 2.9% likely to commit a sex offense. Likewise, this proposition is not supported by the 2008 Seto or 1995 Nagayama, Hall, Hirschman & Oliver studies, which, according to Plaintiffs, included sexual arousal in their statistics, Compl. ¶¶ 132, 135, because "sexually deviant arousal" in and of itself does not constitute a sex offense. Similarly, the 1989 Briere & Runtz survey, as described by Plaintiffs, did not look at whether the individuals studied had actually committed sex offenses.

However, at issue is not whether the Amended Statute creates a "perfect system," but rather whether the State's interest in publishing sex offenders' personal information outweighs those offenders' privacy rights in that information. *See Paul P. II,* 227 F.3d at 102. The Amended Statute already has in place a system to determine which sex offenders pose a great enough risk of re-offense to warrant publication to the NJSOIR via risk assessment hearings through the guidelines set forth by N.J.S.A. 2C:7-8 and N.J.S.A. 2C:7-13. Therefore, in balancing the State's compelling interest against Plaintiffs' privacy interest, the question is not whether the State has accurately assessed any particular individual sex offender's risk of re-offense, but rather whether the system in place reasonably avoids impinging on that sex offender's rights. Based on the extensive framework in place under the Amended Statute to assess sex offenders' recidivism risk, I conclude that the system under the statute is reasonably calculated to publish the information of those sex offenders who pose a heightened risk to the public, while excluding those sex offenders who do not. Thus, even taking into account Plaintiffs' "data," the State still has a compelling interest in publishing the personal information of those offenders who have a sufficient risk of re-offense.

In sum, Plaintiffs' allegations do not demonstrate that the publication of their personal information under the Amended Statute is not calculated to achieve the compelling goal of protecting the public from recidivist sex offenders or unreasonably impinges on their privacy interests. Therefore, because the State's compelling interest in protecting the public substantially outweighs Plaintiffs' interests in the privacy of their home addresses, the Amended Statute does not violate Plaintiffs' right to protect their personal information from publication. Additionally, as discussed above, Plaintiffs have not alleged facts under which any other constitutional rights have been violated by the State. Consequently, Plaintiffs have not sufficiently stated a violation of their

substantive due process rights upon which relief can be granted. I dismiss Counts 1 and 2 of the Complaint.

b.   *Procedural Due Process Claims*

The Fourteenth Amendment Due Process Clause requires that "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n. 7 (1972) (citation and internal quotations omitted). The Third Circuit has found that, pursuant to the Due Process Clause, sex offenders must be notified and given the opportunity to contest their Megan's Law risk assessment and subsequent tier placement. *E.B. v. Verniero*, 119 F.3d 1077, 1111 (3d Cir. 1997). Moreover, at the risk assessment hearing, "the prosecutor has the burden of persuasion and must prove her case by clear and convincing evidence." *Id.*[11]

Here, based on the legal precedent, Plaintiffs argue that because their sentencing hearings only employed a preponderance of the evidence standard to find their conduct compulsive and repetitive, their procedural due process rights will be violated if they are placed on the NJSOIR without an additional hearing to establish compulsive and repetitive behavior by clear and convincing evidence after they have completed their state-mandated treatment.

---

[11] The Court notes that the State, in summarizing the current standard of review for Megan's Law risk assessment hearings, omitted the procedural requirements established in *E.B.* and instead cited an earlier case, *Doe v. Poritz*, 142 N.J. 1 (1995). Def.'s Mem. in Supp. of Mot. to Dismiss p 4. In *Doe v. Poritz*, the New Jersey Supreme Court placed the burden on the convicted sex offender to show by a preponderance of the evidence that the State's proposed level and manner of notification did not conform to Megan's Law and the Attorney General's Guidelines. *Poritz*, 142 N.J. at 32. This approach however was rejected by the Third Circuit's decision in *E.B.*, which established the current standard applied by New Jersey courts today. *In re M.F.*, 169 N.J. 45, 54 (2001) (citing *E.B.*, 119 F.3d 1077).

In *E.B*, a convicted sex offender contested the constitutionality of the community notification provision of New Jersey's Megan's Law. *Id.* at 1081. The *E.B.* court found that the notification provision did not violate the Ex Post Facto and Double Jeopardy clauses of the U.S. Constitution, but did find that it violated certain of plaintiff's procedural due process rights. *Id.* at 1111. Specifically, the *E.B.* court determined that the New Jersey Constitution provided sex offenders a right to privacy in their confidential personal information, which could not be abrogated without "legitimate and substantial government interest" and sufficient procedural safeguards. *Id.* at 1105-6. The *E.B.* court further reasoned that because "liberty interests that trigger procedural due process may be created by state law or by the federal constitution itself," the court need not reach the issue of whether appellants had a privacy interest recognized by the federal constitution. *Id.* at 1105 (citing *Sandin v. Conner*, 515 U.S. 472 (1995)). Subsequent to *E.B.*, the New Jersey Constitution was amended to extinguish any privacy rights sex offenders might have had vis-à-vis the NJSOIR, N.J. Const. art. IV, § 7, ¶ 12, thereby abrogating the procedural due process rights that the *E.B.* court had found under the New Jersey Constitution. Nonetheless, the procedural safeguards imposed by *E.B.* are still applicable after the amendment to the New Jersey Constitution, since the Third Circuit in *A.A. v. N.J.* found sex offenders' privacy interests in their personal information emanates from the federal constitution. *See A.A v. N.J.*, 341 F.3d at 212.[12]

When determining what procedural due process protections are necessary, a court examines

---

[12] The privacy interest in a sex offender's home address found in *A.A. v. N.J.*, 341 F.3d at 212, is substantially similar to the privacy interest in "personal information" found in *E.B.*, 119 F.3d at 1105. Thus, the burden of proof and the standard of review set forth in *E.B.* is equally applicable to the privacy interests, i.e., home addresses, addressed by the Third Circuit in *A.A.*

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "In any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the public and private interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky v. Kramer*, 455 U.S. 745, 745-46 (1982). A court must determine which burden of persuasion and which standard of proof "fairly allocates the risk of an erroneous factfinding between the parties." *E.B.*, 119 F.3d at 1107 (citation and internal quotations omitted).

In *E.B.*, the Third Circuit observed that sex offenders had "a compelling interest in an accurate and reasonable disposition of the issues before the court in a Megan's Law hearing" because "[n]otification puts the registrant's livelihood, domestic tranquility, and personal relationships with all around him in grave jeopardy." *Id.* On the other hand, the Third Circuit recognized that the state had two compelling interests: 1) protecting potential victims of recidivist sex offenders and 2) ensuring that the state's classification and notification system is speedy, fair, and accurate. *Id.* at 1107-8. Given these respective interests, the Third Circuit concluded that "the burden of persuasion must be placed on the state if, compared to proceedings in which that burden is on the registrant, the risk of error will be materially reduced without materially impairing the state's ability to secure a prompt determination and without imposing substantial new administrative burdens on the state." *Id.* at 1108. The *E.B.* court reasoned that because a risk assessment hearing requires the court to undergo complex fact finding involving subjective,

23

psychological evaluations, and is subject to a shorter time table, "the risk of error in such a hearing is substantially greater than that in a typical civil damage suit." *Id.* at 1109. Considering the high risk of error in such a proceeding, requiring the prosecutor to affirmatively convince the court of a plaintiff's risk of re-offense would necessarily materially reduce the risk of error. *Id*. The *E.B.* court anticipated that shifting the burden of proof to the state would not have a significant effect on the proceedings, other than perhaps increasing the amount of live witness testimony utilized by prosecutors. *Id*. The *E.B.* court did not believe that this would materially impair the prosecutors' ability to meet their responsibilities in a timely fashion. *Id*. Consequently, the Third Circuit concluded that due process demanded that prosecutors assume the burden of proof in Megan's Law risk assessment hearings. *Id*.

When assessing whether applying a preponderance of the evidence standard to a Megan's Law hearing fairly allocates the risk of erroneous fact finding between the state and sex offenders, the Third Circuit examined what injuries the parties would suffer if a fact finding error were made. *Id*. at 1110. The *E.B.* court reasoned that an erroneous underestimation of an individual's dangerousness would not necessarily result in harm to protected groups, because the state employed numerous other safeguards to protect the public from recidivist sex offenders, including Megan's Law registration with law enforcement, which is mandatory for all convicted sex offenders regardless of their tier designation. *Id*. On the other hand, the *E.B.* court reasoned that an overestimation of an individual's dangerousness would lead to immediate and irreparable harm to the offender as "the veil of relative anonymity behind which he might have existed disappear[ed]." *Id*. Therefore, the Third Circuit concluded that because the possible injury to an offender from an overestimation of his dangerousness is significantly greater than the danger posed

to the public by an underestimation, it necessarily follows that the Due Process Clause requires the State prove its case by clear and convincing evidence in a Megan's Law proceeding. *Id.* at 1111.

Here, the private and public interests at issue are substantially similar to those examined by the *E.B.* court. Because Plaintiffs allege that their federal constitutional privacy rights are implicated by the publication of their information to the NJSOIR, under *E.B.*, they have alleged an interest in an accurate and reasonable determination of whether their conduct was compulsive and repetitive. On the other hand, under the facts alleged, the State would also have a compelling interest in an accurate and reasonable finding of compulsivity and repetitiveness. And, the State would also be equally interested in an expedited process, so that it may provide community notification expeditiously. Mirroring the *E.B.* court, this Court may find that heightened procedural due process requirements are necessary "if, compared to proceedings in which that burden is on the registrant, the risk of error will be materially reduced without materially impairing the state's ability to secure a prompt determination and without imposing substantial new administrative burdens on the state." *Id.* at 1108.

Based on all the allegations, it is certainly plausible that as with a Megan's Law risk assessment, determining compulsive and repetitive conduct may require a court to make complex determinations of fact, which would be difficult to make accurately on a short timetable. *See State v. Howard*, 110 N.J. 113, 130 (1988) (finding of compulsive and repetitive "necessitates the review of psychological and psychiatric reports, which often involve the interpretation of facts and which are subject to the subtleties and nuances of psychiatric diagnosis" (citation and internal quotations omitted)). Indeed, contrary to the State's argument, where such a finding requires complex and subjective determinations of fact, the allocation of the burden of persuasion to the prosecutor will substantially reduce the risk of an erroneous outcome. *See E.B.*, 119 F.3d at 1109. Moreover,

25

absent a fuller record, on this motion to dismiss, it is at least plausible that shifting this burden to the State would likely not materially impair the State's ability to secure a prompt determination or impose substantial new administrative burdens, because the State already has a comprehensive system to make risk assessments under Megan's Law, and compulsive and repetitive conduct is already one of the factors considered by a court when determining risk of re-offense. N.J.S.A. 2C:7-8(b)(3)(a).

The Supreme Court has mandated a clear and convincing standard of proof "when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money" and where, "notwithstanding the state's civil labels and good intentions," an individual is threatened with "a significant deprivation of liberty or stigma." *E.B.*, 119 F.3d at 1111 (quoting *Santosky*, 455 U.S. at 756) (internal quotations omitted). Under the facts alleged by Plaintiffs, an overestimation of an individual's compulsiveness and repetitiveness will lead to immediate and irreparable harm to the offender, while an erroneous underestimation of an individual's compulsiveness and repetitiveness will not necessarily result in harm to protected groups. *See id.* at 1110. Indeed, as discussed by the *E.B.* court, there are a number of systems in place to protect the public, including the requirement that convicted sex offenders of all tiers must register regularly with local law enforcement, N.J.S.A. 2C:7-2, and the provision for risk assessment hearings. *Id.* Because the alleged possible injury to convicted sex offenders is significantly greater than possible harm to the State, Plaintiffs should not be asked to share equally with society the risk of error under a preponderance of the evidence standard. *See id.* at 1111. It necessarily follows that, under the facts alleged, the Due Process Clause requires that the State prove Plaintiffs' compulsivity and repetitiveness by clear and convincing evidence. *See id*.

26

Plaintiffs, however, allege that the State of New Jersey only applies a preponderance of the evidence standard when making findings of compulsivity and repetitiveness at sentencing. N.J.S.A. 2C:47-3; *Howard*, 110 N.J. at 131. Unlike the instant case, a preponderance of the evidence standard is appropriate at a sentencing hearing because the criminal defendant has already been adjudged guilty beyond a reasonable doubt and "the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him." *McMillan v. Pennsylvania*, 477 U.S. 79, 92 n. 8 (1986) (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976)). Here, however, Plaintiffs have already served their sentences, been treated, and are no longer confined. Accordingly, determining that an individual satisfies the criteria under Megan's Law to be published to the NJSOIR "is a civil proceeding that stands apart from the criminal proceeding in which one was convicted and sentenced." *E.B.*, 119 F.3d at 1111.

In sum, Plaintiffs allege that the State seeks to add them to the NJSOIR based on findings of compulsive and repetitive conduct made at sentencing under a preponderance of the evidence standard, as opposed to using a clear and convincing standard for purposes of NJSOIR publication. I find that Plaintiffs have sufficiently alleged that such an application of the law may deprive them of certain procedural due process protections under *E.B.* Defendant's motion to dismiss Count 3 of Plaintiffs' Complaint is denied.[13]

---

[13] Plaintiffs also argue that substituting a decades-old decision (finding compulsive and repetitive at sentencing) for a court's more recent decision (finding low risk at Megan's Law hearing) violates procedural due process. However, I need not address that additional basis for Plaintiffs' procedural due process claim, since I have already determined that a claim is stated.

   ***b.*** *Equal Protection Claims*

Plaintiffs claim that the Amended Statute is unequally applied to three different classes of individuals, in violation of the Equal Protection Clause of the Fourteenth Amendment. In that connection, Plaintiffs argue that the statute unconstitutionally distinguishes between 1) sex offenders and other classes of offenders; 2) sex offenders found to be compulsive and repetitive and sex offenders who were not; and 3) sex offenders convicted in-state and sex offenders convicted out-of-state, who have subsequently moved to New Jersey.

The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prevail on an equal protection claim, a plaintiff must present evidence that he has been treated differently from persons who are similarly situated. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Here, the Amended Statute on its face distinguishes between sex offenders and other offenders, because only sex offenders are subject to the law. Likewise, the statute clearly distinguishes between sex offenders found to be compulsive and repetitive and other sex offenders, because only the Tier 1 offenders who were also found compulsive and repetitive are subject to NJSOIR notification. These distinctions must be analyzed under equal protection principals to determine whether they violate Plaintiffs' constitutional rights.

On the other hand, however, the Amended Statute does not, on its face, discriminate between sex offenders who were convicted in-state and those convicted out-of-state and have since moved to New Jersey. The Amended Statute does not proscribe different treatment for sex offenders on the basis of where they were convicted. When discrimination is not clear on the face of the statute, a plaintiff must establish, through other collateral or circumstantial evidence, that the state has an intent to discriminate. *See Miller v. Johnson*, 515 U.S. 900, 916-17 (1995).

28

Discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

On this issue, Plaintiffs argue that because other states do not assess compulsivity and repetitiveness at sentencing, out-of-state sex offenders are functionally excluded from the new NJSOIR notification requirements for offenders found to be compulsive and repetitive at sentencing. According to Plaintiffs, the Amended Statute has a disproportionate impact on in-state sex offenders, because they are now more likely to be listed on the NJSOIR than out-of-state offenders. However, standing alone, disproportionate impact is not sufficient to state a *prima facie* case of intentional discrimination under equal protection. *Washington v. Davis*, 426 U.S. 229, 242 (1976). Indeed, at no point in the Complaint did Plaintiffs allege that the state legislature passed the Amended Statute *because* they wanted to discriminate against in-state sex offenders. Under the facts alleged by Plaintiffs, there is nothing to indicate that the Amended Statute was not passed merely *in spite of* the disproportionate impact on in-state sex offenders. Without an allegation of discriminatory intent, Plaintiffs cannot claim a violation of in-state sex offenders' equal protection rights.[14]

In the next step of the equal protection analysis, the court must determine which standard of review applies to its assessment of the challenged law. Laws that involve a suspect or quasi-suspect classification, such as race, religion, alienage, or gender, are subject to a heightened

---

[14] However, the Court notes that to the extent that Plaintiffs succeed on their claim that procedural due process requires that the State implement additional hearings to determine by a clear and convincing standard that an individual offender's conduct is compulsive and repetitive, such hearings would necessarily have to be provided to all offenders subject to the Amended Statute, regardless of whether they were convicted in-state or out-of-state.

standard of review. *City of Cleburne*, 473 U.S. at 440-41. "Similar oversight by the courts is due when state laws impinge on personal rights protected by the Constitution." *Id.* at 440. On the other hand, if the law does not involve a suspect or quasi-suspect classification or fundamental constitutional right, then it "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.*

The Third Circuit has specifically recognized that the category of repetitive and compulsive sex offenders is not a suspect or quasi-suspect class. *Artway v. Attorney Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996). Additionally, other circuits have found sex offenders are not a suspect class. *Doe v. Moore*, 410 F.3d 1337, 1342-48 (11th Cir. 2005) (finding under the "rational basis" test no equal protection violation with respect to Florida's sex offender registration-notification law); *United States v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001) (finding rule permitting admission of evidence of similar crimes in child molestation cases did not violate equal protection); *Cutshall v. Sundquist*, 193 F.3d 466, 482-83 (6th Cir. 1999) (Tennessee Registration and Monitoring Act "subject to scrutiny under rational basis test" and does not violate equal protection). Here, it is clear that sex offenders, compulsive and repetitive or otherwise are neither suspect nor quasi-suspect classes under the Equal Protection Clause.

Next, I turn to whether the Amended Statute impinges on a fundamental constitutional right under the meaning of the Equal Protection Clause. As discussed above, sex offenders have a constitutionally protected interest in the privacy of their home addresses. *A.A v. N.J.*, 341 F.3d at 212. Of the two general categories of constitutionally protected privacy rights, this falls under the purview of privacy of information, rather than privacy of important life decisions. *See Whalen*, 429 U.S. at 599-600. The Supreme Court has explicitly treated the second category of privacy rights -- privacy in decisions -- as a fundamental right under the meaning of the Equal Protection

30

Clause. *See, e.g., Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 7 (1974); *Eisenstadt v. Baird,* 405 U.S. 438, 447 (1972); *Stanley v. Illinois*, 405 U.S. 645, 658 (1972). However, the first category of privacy rights -- information privacy -- has not been explicitly addressed by the Supreme Court or the Third Circuit in equal protection cases. The Third Circuit, however, in *A.A. v. N.J.* and *Paul II*, clearly did not consider sex offenders' "nontrivial" informational privacy rights to be fundamental rights in the context of substantive due process and procedural due process. Indeed, rather than apply the Supreme Court's test to determine whether a fundamental right had been violated under the Due Process Clause, which examines if the statute is narrowly tailored to achieve a compelling governmental interest, *Fed. Election Comm'n v. Wis. Right To Life, Inc.,* 551 U.S. 449, 464 (2007), the Third Circuit instead applied a balancing test, which examined whether the governmental interest in publishing the information at issue outweighed plaintiff's interest in keeping such information private. *A.A v. N.J.*, 341 F.3d at 211; *Paul P. II*, 227 F.3d at 102. In so doing, the Third Circuit did not consider sex offenders' privacy interests in their home addresses to be a *fundamental* constitutional right, and therefore that right was not deserving of strict scrutiny review. *See A.A. v. N.J.*, 341 F.3d at 211; *Paul P. II*, 227 F.3d at 102. While the Third Circuit's decision was made in the context of substantive and procedural due process, the court's reasoning applies with equal force in analyzing the same privacy interests under equal protection. Thus, I find that Plaintiffs' privacy interests in their home addresses are not fundamental rights under an equal protection analysis. In that regard, this Court need only examine whether the classifications made by the Amended Statute are "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440; *see also Shoemaker v. Handel,* 619 F. Supp. 1089, 1105 (D.N.J. 1985) *aff'd*, 795 F.2d 1136 (3d Cir. 1986) (finding plaintiffs had sufficient privacy interests in medical information under the Due Process Clause to require the administration of medical tests in privacy,

31

but applying rational basis review to plaintiffs' equal protection claims, because no fundamental rights were at issue).[15]

A statute will withstand rational basis review, "if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute." *Sammon v. N.J. Bd. of Medical Exam'rs*, 66 F.3d 639, 644 (3d Cir. 1995). However, "[t]he law need not be in every respect consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Rogin v. Bensalem Township*, 616 F.2d 680, 689 (3d Cir. 1980) (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-88 (1955)); s*ee also Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 682 (3d Cir. 1991).

The Third Circuit has repeatedly cautioned that a court engaging in rational basis review is not entitled to

> second guess the legislature on the factual assumptions or policy considerations underlying the statute. If the legislature has assumed that people will react to the statute in a given way or that it will serve the desired goal, the court is not authorized to determine whether people have reacted in the way predicted or whether the desired goal has been served.

*Sammon*, 66 F.3d at 645. The sole question is "whether the legislature rationally might have believed the predicted reaction would occur or that the desired end would be served." *Id*. When legislation is being tested under rational basis review, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification [of the statute] is apparently based could not reasonably be conceived as true by the governmental decisionmaker."

---

[15] This case was affirmed in *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir. 1986), but privacy rights were not discussed in the Third Circuit's opinion, because changed regulations in the intervening year rendered the plaintiffs' original privacy concerns moot.

*Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)); *see also Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1034-35 (3d Cir. 1987).

Indeed, "those attacking the rationality of the legislative classification have the burden 'to negat[e] every conceivable basis which might support it.'" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *see, e.g., Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (finding that laws scrutinized under rational basis review are "accorded a strong presumption of validity"); *Hodel v. Indiana*, 452 U.S. 314, 331-32 (1981). Ordinarily, that burden is insurmountable. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (citation and internal quotations omitted).

The Supreme Court has held that "legislative choice[s] [are] not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id* at 313. The rationale for such a deferential standard is that the legislative process will, from time to time, yield imperfect results, but "[o]nly by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." *Lehnhausen*, 410 U.S. at 365 (citation and internal quotations omitted). "[T]he Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even

improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440 (citation omitted). Nevertheless, the rational basis test is not a "toothless" one, *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), and it is "the function of courts . . . to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." *Nebbia v. New York*, 291 U.S. 502, 536 (1934).

Here, Plaintiffs do not contest that protecting the public from sex offenses is a compelling governmental interest, instead they challenge whether the classifications at issue are rationally related to that interest. In support of these arguments, Plaintiffs, once again, cite to numerous scientific studies that they do not identify by name or attach to their Complaint. As discussed above, because the Court has had no opportunity to review these studies, *see W. Pa. Allegheny Health Sys., Inc.,* 627 F.3d at 97 n. 6, the Court finds that Plaintiffs' allegations of fact made in reliance on these studies cannot support the plausibility of their claims. Without these scientific studies, Plaintiffs have no other support for their arguments that the State has no rational basis upon which to make the classifications at issue. Consequently, the Amended Statute is presumed to be valid under the Equal Protection Clause. As such, I decline to address Plaintiffs' arguments that the State's distinctions -- between sex offenders and other classes of offenders, as well as those sex offenders who were found compulsive and repetitive and those who were not -- are not reasonably related to protecting the public based on the alleged studies and their statistical results. However, even if the Court were to consider those arguments, Plaintiffs' allegations in this regard suffer the same infirmities as those found in the substantive due process analysis, *supra*. Accordingly, Plaintiffs' claims that the Amended Statute violates the Equal Protection Clause do not survive review under Rule 12(b)(6). Because the Amended Statute on its face does not

34

discriminate against in-state sex offenders, and because Plaintiffs do not adequately allege that the State intentionally discriminated against in-state sex offenders, they do not sufficiently state a claim of equal protection violation vis-à-vis this class. Additionally, Plaintiffs have failed to allege that the Amended Statute is not rationally related to the legitimate and compelling state interest of protecting the public. Thus, I dismiss Counts 4 and 5 of Plaintiffs' Complaint.

### c.  *Claims Brought on Behalf of Minor Plaintiffs*

Plaintiffs bring two separate claims on behalf of Minor Plaintiffs: denial of substantive due process and denial of equal protection. Generally, Plaintiffs allege that if their information is published to the NJSOIR, private parties will attack and harass Minor Plaintiffs, potentially causing significant physical and psychological trauma. Plaintiffs argue that because such attacks impinge Minor Plaintiffs' rights to privacy and to associate, and because such attacks result from Plaintiffs' listing on the NJSOIR, pursuant to the Amended Statute, the law violates the Substantive Due Process and Equal Protection Clauses of the Fourteenth Amendment.

However, as discussed *supra*, the State cannot be held responsible for the independent action of private individuals. *See Blum*, 457 U.S. at 1004. Because Plaintiffs do not sufficiently allege that the State actively coerced or encouraged private party attacks and harassment of sex offenders, as a matter of law, the State is not responsible for the actions of these private parties. Likewise, nowhere in the Complaint do Plaintiffs allege that the State has actively coerced or encouraged attacks and harassment of the children of sex offenders. Therefore, such alleged attacks and harassment, while abhorrent, cannot be considered state action for the sake of Minor Plaintiffs' claims. Moreover, there are no allegations that the Amended Statute directly affects Minor Plaintiffs' constitutional rights. Indeed, on a claim of violation of substantive due process, if the law at issue does not implicate a plaintiff's fundamental constitutional rights, the court merely

35

analyzes whether it is rationally related to a legitimate governmental interest. *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). Here, at minimum, the State has a legitimate interest in protecting the public from recidivist sex offenders, and publishing the information of sex offenders to the NJSOIR is rationally related to achieving that governmental interest. Therefore, the Amended Statute does not violate Minor Plaintiffs' rights under the Substantive Due Process Clause.

Plaintiffs also argue that, in violation of the Equal Protection Clause, the Amended Statute unconstitutionally discriminates against children of sex offenders, because it prioritizes protecting potential child victims of sexual assault over protecting Minor Plaintiffs from attacks and harassment by private parties. Plaintiffs' argument, however, relies on a false dichotomy. The Amended Statute does not discriminate among various classes of children. Indeed, at no point does the Amended Statute impose any burdens on the children of sex offenders, or classify them in any way. Rather, the Amended Statute protects all children equally from potential sexual assault by providing their guardians with information about convicted sex offenders in New Jersey. N.J.S.A. 2C:7-12. The minor children of sex offenders are also protected by the Amended Statute, as it can provide information to their guardians about other convicted sex offenders with which they might have contact. Even if I construe Plaintiffs' claim to be one of disproportionate impact against the children of sex offenders, Plaintiffs have not alleged that the State intended to discriminate against this class. *See* 426 U.S. at 242. Therefore, Plaintiffs have failed to state a claim under the Equal Protection Clause on behalf of Minor Plaintiffs for which relief may be granted. Thus, I dismiss Count 6, Minor Plaintiffs' equal protection claims, and all substantive due process claims made on behalf of these parties in Counts 1 and 2. Additionally, because I have dismissed

all of Minor Plaintiffs' claims, I will also deny Plaintiffs' application to appoint *pro bono* counsel on behalf of Minor Plaintiffs as moot.

    d.  *Appointment of Pro Bono Counsel for Plaintiffs*

        Plaintiffs have applied, pursuant to 28 U.S.C. § 1915(e)(1), for the appointment of *pro bono* counsel on their behalf. At the outset, I note that a civil litigant does not have a constitutional or statutory right to appointed counsel. *Montgomery v. Pinchak,* 294 F.3d 492, 498 (3d Cir. 2002) (citing *Parham v. Johnson*, 126 F.3d 454, 456–57 (3d Cir. 1997)). However, the Court has broad discretion, under 28 U.S.C. § 1915, to appoint *pro bono* counsel to represent indigent litigants, *Parham*, 126 F.3d at 456–57, and may grant a properly filed application for appointment of *pro bono* counsel if the plaintiff's claims have some "arguable merit in fact and law." *Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993). In addition, in order to appoint *pro bono* counsel, the Court must consider the following non-exhaustive list of "*Tabron*" factors: 1) the plaintiff's ability to present his or her own case; 2) the difficulty of the particular legal issues; 3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue investigation; 4) the plaintiff's capacity to retain counsel on his or her own behalf; 5) the extent to which a case is likely to turn on credibility determinations, and; 6) whether the case will require testimony from expert witnesses. *Montgomery*, 294 F.3d at 499 (citing *Tabron*, 6 F.3d at 155-57); *see also Parham*, 126 F.3d at 461 ("The *Tabron* factors will ensure that courts do not appoint counsel to frivolous cases."). "[W]here a plaintiff's case appears to have merit and most of the aforementioned factors have been met, courts should make every attempt to obtain counsel." *Parham*, 126 F.3d at 461. However, *pro bono* attorney time is a precious commodity, and thus courts should exercise care in appointing counsel. *Montgomery*, 294 F.3d at 499.

First, the Court must determine whether Plaintiffs' claims have some merit in fact and law. *Tabron*, 6 F.3d at 155. The Court's discussion of Plaintiffs' claims in the context of this substantive motion to dismiss has established that, assuming Plaintiffs' allegations are true, some of their claims have merit in fact and law. Importantly, Plaintiffs seek to bring these claims on behalf of class members similarly situated. Therefore, when determining whether counsel should be appointed, the Court must bear in mind this fact.

As to the first *Tabron* factor, a plaintiff's ability to present his own case is the most significant factor. *Montgomery*, 294 F.3d at 501. To determine whether a plaintiff has this ability, a court examines his education, literacy, prior work experience, and prior litigation experience, as well as his ability to understand English. *Id.* Additionally, a court will examine whether plaintiff has access to "necessary resources like a typewriter, photocopier, telephone, and computer." *Parham*, 126 F.3d at 459. Here, Plaintiffs appear to be fluent in English, but the full extent of Plaintiffs' education, prior work experience, and prior litigation experience is unknown. Plaintiff Z.R. has alleged that he is employed as an IT specialist and part-time paralegal, a position which does not require any minimum level of education or training in New Jersey. Compl. ¶ 30; *see* N.J. Rules Prof'l Conduct R. 5.3. Plaintiff L.A. has stated that he is "pursuing his education so as to enable him to start his own business." Compl. ¶ 17. In the Court's view, Plaintiffs have adequately represented themselves by properly filing their Complaint, as well as filing their briefs in opposition of Defendant's motion to dismiss. However, the Court must not only consider whether Plaintiffs can adequately represent themselves; the Court must also take into account that Plaintiffs seek to bring their claims on behalf of a putative class. Importantly, "*[p]ro se* plaintiffs are not favored as representative parties in a class action, as they generally cannot represent and protect the interests of the class fairly and adequately." *Cahn v. United States*, 269 F. Supp. 2d 537, 547

38

(D.N.J. 2003); *see also Caputo v. Fauver*, 800 F. Supp. 168, 170 (D.N.J. 1992), *aff'd*, 995 F.2d 216 (3d Cir. 1993). Therefore, because Plaintiffs are *pro se* litigants who do not appear to have formal training in the law, they will not be able to represent the interests of Class A and maintain this suit as a class action. *See Cahn*, 269 F. Supp. 2d at 547; *Krebs v. Rutgers*, 797 F. Supp. 1246, 1261 (D.N.J. 1992) (denying class certification to *pro se* plaintiffs without sufficient legal education). Thus, the first *Tabron* factor weighs in favor of appointing *pro bono* counsel.

Second, where legal issues involved in a case are complex, "it will often best serve the ends of justice to have both sides of a difficult legal issue presented by those trained in legal analysis." *Tabron*, 6 F.3d at 156 (citation omitted). There is no doubt that this case involves complex questions of constitutional law that would be very difficult for any pro se plaintiff without formal legal training to competently litigate. Thus, it would be in the interests of justice to appoint a *pro bono* counsel.

Third, in examining the degree to which factual investigation will be required and the ability of the plaintiff to pursue such investigation, the court analyzes whether his claims are likely to "require extensive discovery and compliance with complex discovery rules." *Id.* Here, Plaintiffs' surviving procedural due process claims do not appear to require extensive discovery or involve complex discovery rules, as they seem to turn primarily on what procedures the State has instituted to determine whether an individual sex offender's conduct is compulsive and repetitive. And, those questions are primarily legal in nature. However, it is not known at this time whether extensive factual discovery would be necessary. Thus, this *Tabron* factor is neutral.

Fourth, if counsel is easily attainable and affordable by the litigant, but the plaintiff simply has made no effort to retain an attorney, then the court should not appoint *pro bono* counsel. *Id.* at 157 n. 5. Moreover, 28 U.S.C. § 1915(e)(1) only allows the court to appoint *pro bono* counsel to

represent litigants who are "unable to afford counsel." 28 U.S.C. § 1915(e)(1). Here, however, Plaintiffs have represented that they have asked several attorneys to represent them in this matter *pro bono*, but these attorneys declined due to the complex nature of the case. Pls.' Appl. for Pro Bono Counsel. Additionally, Plaintiffs have submitted financial affidavits indicating that they cannot afford to retain counsel. Judge Pisano previously analyzed these financial affidavits and denied Plaintiffs' applications to proceed *in forma pauperis*, based on the determination that Plaintiffs were capable of paying their filing fees. Nonetheless, on the basis of the same affidavits, I find that Plaintiffs' incomes are not sufficient to retain counsel, as the cost of retaining counsel will be significantly greater than the filing fees. Indeed, the Court has the discretion to determine at any time whether Plaintiffs qualify as indigent. *See, e.g. Bondarenko v. Hackensack Univ. Med. Ctr.,* No. CIV.A.07-3753(PGS), 2009 WL 2905373, at *4 (D.N.J. Sept. 4, 2009) (finding that plaintiff could not afford to retain counsel, despite the fact that plaintiff had not applied to proceed *in forma pauperis*); *Allebach v. Cathel*, No. CIV.A. 06-5005 (JAG), 2007 WL 446640 at *1-2 (D.N.J. Feb. 7, 2007) (applying the *Tabron* factors to an application for *pro bono* counsel, despite the fact that plaintiff had not applied to proceed *in forma pauperis*). Moreover, Plaintiffs have not been able to retain counsel, despite undertaking efforts to do so. Therefore, the fourth *Tabron* factor weighs in favor of appointing *pro bono* counsel.

As to the fifth and sixth factors, the court examines whether the case is solely a "swearing contest" and whether the case requires expert testimony. *Parham*, 126 F.3d at 460. Here, the case does not seem likely to turn on credibility determinations. At this juncture, however, it is not known whether experts may be necessary for Plaintiffs' procedural due process claims. Thus, the fifth factor does not weigh in favor of appointing *pro bono* counsel, and the sixth factor is neutral.

In sum, at least three of the six *Tabron* factors, including the most significant factor, weigh in favor of appointment of counsel. Because Plaintiffs bring this suit as a class action, and do not appear to have any formal legal training, they will not be able to adequately represent both themselves and Class A. Moreover, the legal questions at issue in this case are complex, such that the interests of justice would be best served by appointing counsel. Additionally, Plaintiffs have made a good faith effort to retain counsel, but have been unable to do so. And finally, the Court finds that Plaintiffs are unable to afford the cost of retaining counsel. Therefore, the *Tabron* factors weigh in favor of appointing *pro bono* counsel, and the Court will appoint an appropriate *pro bono* counsel to represent Plaintiffs in this matter.

**IV.    CONCLUSION**

Defendant's motion to dismiss is granted in part and denied in part. The Court dismisses Counts 1 and 2, Plaintiffs' and Minor Plaintiffs' substantive due process claims, and Counts 4, 5, and 6, Plaintiffs' and Minor Plaintiffs' equal protection claims. However, Count 3, Plaintiffs' procedural due process claim, survives. Additionally, Plaintiffs application for *pro bono* counsel to represent Plaintiffs is granted, but Plaintiffs application for *pro bono* counsel to represent Minor Plaintiffs is denied as moot

Once *pro bono* counsel is selected, counsel shall have the opportunity to review this Court's Opinion and assess whether additional claims should be asserted and whether to re-plead any claims. If so, counsel shall be given leave to amend the Complaint to include those causes of action.

Dated: October 28, 2015

                                         /s/ Freda L. Wolfson
                                        Freda L. Wolfson
                                        U.S. District Judge

42